Roy L. BEAVERS, Jr. and Valerie
E. Beavers, Appellants,

v.

RECREATION ASSOCIATION OF
LAKE SHORE ESTATES,
INC., Respondent.

No. 25556.

Missouri Court of Appeals,
Southern District,
Division One.

Feb. 27, 2004.

Motion for Rehearing or Transfer Denied
March 24, 2004.

Application for Transfer Denied
April 27, 2004.

Richard L. Schnake, Neale & Newman, L.L.P., Springfield, for Appellants.

Thomas J. O'Neil, O'Neil & Allen, Lebanon, for Respondent.

ROBERT S. BARNEY, Presiding Judge.

Roy L. Beavers, Jr. and Valerie E. Beavers (collectively "Appellants," individually "Roy" and "Valerie," respectively) are owners or have an interest in Lots 6 and 7 of Lake Shore Estate subdivision in Laclede County, Missouri.[1] They appeal from the judgment of the trial court dismissing their petition for declaratory judgment and injunctive relief against Respondent Recreation Association of Lake Shore Estate ("the Association") arising from the Association's assessments and liens placed on Lots 6 and 7 in 2001 and 2002.

In their petition, Appellants sought a declaration that the liens filed by the Association against Lots 6 and 7 based on Appellants' failure to pay the annual assessments were void. Appellants charged that the Association was a "pretended" corporation with no legal existence and, therefore, was incapable of establishing an-

1. The legal titles to Lots 6 and 7 are currently held by Valerie individually.

nual assessments and imposing liens against Lots 6 and 7.[2]

In their action for injunctive relief, Appellants sought to prevent the Association and others from entering any future assessments and liens against Lots 6 and 7. Appellants also appeal from the trial court's finding and judgment in favor of the Association on its counterclaim for past assessments and attorney fees.

The record shows that developers John M. Bailey and Shirley Bailey ("the Baileys") originally incorporated the Association as a not-for-profit corporation on August 21, 1972. The first bylaws of the Association provided that the Association was "organized to further and promote the common interest of the property owners and to organize, operate, maintain and supervise recreational facilities and activities for the benefit of the residents of Lake Shore Estates."

On February 20, 1974, Appellants purchased Lot 7 from the Baileys.[3] As part of the real estate contract, Appellants automatically became members of the Association.

In 1980, the Association failed to file the annual report required by section 355.330, RSMo 1986, which, pursuant to section 355.507.1, RSMo 1986, resulted in a forfeiture of the corporate charter effective January 1, 1981.[4] The Association applied for a rescission of the forfeited corporate charter on April 1, 1991, ten years *and three months* after the forfeiture was made effective on January 1, 1981. The Secretary of State issued a Certificate of Rescission of Forfeiture ("the rescission") on the same day the application was received.[5]

In 1993, the Association bylaws were revised to require the payment of an annual assessment to qualify as a member of the Association. The bylaws were revised yet again in 2000 to allow the Association to place a lien on the property of any property owner who failed to pay the annual assessment.

On November 7, 2000, Appellants received a letter informing them that if they failed to pay the 2000 annual assessment by December 1, 2000, the Association would place a lien on Lots 6 and 7. Appellants did not pay the annual assessment, and the Association recorded a lien for $225.40 against Lots 6 and 7 on February 1, 2001. The Association filed another lien for $190.45 against Lots 6 and 7 on April 1, 2002.

As previously set out, Appellants filed a petition for declaratory judgment and in-

2. Appellants contend the Association was not a legally existing corporate entity because the Association's charter had been previously forfeited and the Secretary of State's rescission of forfeiture was untimely under former section 355.507, RSMo 1986 (repealed 1994, effective July 1, 1995).

3. This parcel of land was transferred to Valerie alone in 1979. Valerie purchased Lot 6 from a trustee in bankruptcy on January 31, 1991.

4. We note the statutes under discussion did not change from the RSMo 1978 version applicable at the time of the forfeiture of the Association's charter to the time of the RSMo 1986 version applicable at the time of the rescission. For clarity in analysis, when discussing the forfeiture and rescission, we refer only to the RSMo 1986 version of the same statutory enactment. Furthermore, we note chapter 355 was repealed in its entirety in 1994 and forego noting the repeal in the remaining cites to the RSMo 1986 version.

5. At the time the rescission was issued, the statutory provision relating to rescission of forfeiture of a corporate charter provided a *ten-year* time limit on the issuance of a rescission of forfeiture of a corporate charter. § 355.507, RSMo 1986. The statute expressly set out that: "No rescission shall be made after ten years following forfeiture under this section." § 355.507.4, RSMo 1986.

junctive relief on May 11, 2001. The Association filed its answer and counterclaim for past assessments and attorneys fees on June 13, 2001. Appellants filed an amendment by interlineation to the petition on November 5, 2002. The trial court dismissed Appellants' petition for declaratory judgment and injunctive relief and found for the Association on its counterclaim for past assessments and attorneys fees.

The trial court included in its judgment several findings of fact and conclusions of law supporting its decision.

The trial court determined that the Association "is a corporation in good standing and validly existing under the laws of the State of Missouri." The trial court found the provisions of section 355.507, RSMo 1986 did not apply because a "certificate of reinstatement by the Secretary of State of Missouri of the corporate status of [the Association] is a final determination of the corporation's right to do business in the State of Missouri and [Appellants] cannot collaterally attack the legal status of the [Association]." The trial court further found section 355.507, RSMo 1986 did not apply because the section is procedural in nature, and newly enacted section 355.716, RSMo 2000, "is to be applied retroactively and the prohibition against reinstatement after ten years is no long[er] applicable." See footnote 6 hereof. The trial court also concluded Appellants were barred from challenging the rescission of the forfeiture of the corporate charter based on the applicable ten-year statute of limitations period. Moreover, the trial court determined Appellants "are contractually bound to recognize the corporate validity of [the Association]," and that "this obligation became contractually binding on them at the time they purchased their first lot in the subdivision." Lastly, the trial court determined Appellants were estopped from challenging the validity of the Association as a corporation and its ability to set, collect, and levy liens for annual assessments.

■ Although the trial court denied Appellants' declaratory judgment and issued a judgment in favor of the Association, we review this case under the same standard as if the declaratory judgment was ordered. *Andresen v. Board of Regents,* 58 S.W.3d 581, 585 (Mo.App.2001). "This court reviews a declaratory judgment under the standard applicable to other court-tried cases." *Id.* The standard of review in a court-tried case is set out in *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976). We affirm the trial court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Id.* at 32.

Appellants raise six points on appeal. Points One, Two, Three and Six are dispositive of the appeal, and for the sake of clarity, will be addressed out of order. Consequently, the remaining points are moot and need not be addressed.

■ In Appellants' first point on appeal, they maintain that the trial court erred in dismissing their petition, entering judgment against them for unpaid assessments, interest, attorneys fees, and costs and erred by "impressing" Lots 6 and 7 with liens for assessments for the years 2000 and 2001. They reason that the Association is a "pretended corporation with no actual existence" and thereby had no lawful authority to act and as such, Appellants are able to collaterally attack the corporate status of the Association.

Appellants claim the Association's application to rescind the forfeiture of its charter and the purported rescission were untimely under former section 355.507.4, RSMo 1986, in that the Secretary of State had no authority to rescind the forfeiture

more than ten years after the forfeiture. *See* footnote 5 hereof. Consequently, they maintain, the Association had no power to levy assessments or impress liens upon Valerie's lots for the years 2000 and 2001.

Appellants also assert the repeal of section 355.507, RSMo 1986 and the enactment of section 355.716, RSMo 2000 did not retroactively remove the ten-year deadline for rescission of forfeiture.

■ We initially observe that, generally, the final determination of a corporation's right to do business is made when the Secretary of State issues a certificate of incorporation and such a determination may only be challenged in a direct proceeding by the state. *Levey v. Roosevelt Fed. Sav. & Loan Ass'n,* 504 S.W.2d 241, 245 (Mo.App.1973). However, as explained below, there are situations in which the corporation's right to do business may be challenged in a collateral attack, either by the state or by private individuals. *See Leibson v. Henry,* 356 Mo. 953, 204 S.W.2d 310, 316 (banc 1947); *see also Pearson Drainage Dist. v. Erhardt,* 239 Mo.App. 845, 201 S.W.2d 484, 489 (1947).

We now must determine if the instant case presents such circumstances.

At the time the rescission was entered, the applicable statute guiding the actions of the Secretary of State read, in pertinent part:

4. The secretary of state may, *within ten years of forfeiture,* rescind the forfeiture of the corporate rights and privileges of any domestic or foreign corporation declared under the provisions of this section, upon the filing of an affidavit signed by either the president, a vice president, the secretary or the treasurer of such corporation, reciting that the annual report for failure to file which the corporation's rights had been forfeited had been duly prepared and filed with the secretary of state prior to or concurrently with the filing of the affidavit.... *No rescission shall be made after ten years following forfeiture under this section.*

§ 355.507.4, RSMo 1986 (emphasis added). Under this section, when a corporation's charter was forfeited, the corporation *ipso facto* ceased to exist as of the date of forfeiture, but it remained subject to the possibility of a rescission of the forfeiture within the ten-year time period. *See Leibson,* 204 S.W.2d at 316–17; *see also Bradley v. Reppell,* 133 Mo. 545, 32 S.W. 645, 646 (1895).[6]

As previously set out, the Association failed to file the annual report required by section 355.330, RSMo 1986, which, pursuant to section 355.507, RSMo 1986, resulted in a forfeiture of the corporate charter effective on January 1, 1981. On April 1, 1991, ten years *and three months* after the forfeiture was made effective, the Association filed an application for rescission of

6. In the 1995 revision of the chapter, section 355.507, RSMo 1986 was repealed and new section 355.716, RSMo 1994 was enacted. This section relating to rescission was amended again in 1998 and now provides, in pertinent part:

1. A corporation administratively dissolved under section 355.711 may apply to the secretary of state for reinstatement.

2. If the secretary of state determines that the application contains the information required by subsection 1 of this section and

that the information is correct, the secretary of state shall cancel the certificate of dissolution and prepare a certificate of reinstatement reciting that determination and the effective date of reinstatement, file the original of the certificate, and serve a copy on the corporation under section 355.176.

§ 355.716, RSMo 2000. The 1995 revision included a two-year time limit on applications for rescission of forfeiture. *See* § 355.716, RSMo 1994.

forfeiture of the corporate charter together with the required annual reports, and the rescission was issued by the Secretary of State on that day.[7] The rescission expressly recited that the Association's charter had been forfeited on January 1, 1981.

■ As previously set out, in reaching its decision the trial court found the rescission of forfeiture of the corporate charter to be a procedural issue, and therefore, the new statute, section 355.716, RSMo 2000, "is to be applied retroactively and the prohibition against reinstatement after ten years is no long[er] applicable." We disagree.

■ Under the rules of statutory construction, statutory provisions that are substantive are presumed to operate prospectively, unless the legislative intent that they operate retroactively clearly appears from the express language of the act or by necessary or unavoidable implication. *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 872 (Mo. banc 1993); *see also Doe v. Roman Catholic Diocese*, 862 S.W.2d 338 (Mo. banc 1993). "On the other hand, '[a] statutory provision that is remedial or procedural operates retrospectively unless the legislature expressly states otherwise.'" *Callahan*, 863 S.W.2d at 872 (quoting *Wilkes v. Mo. Highway & Transp. Comm'n*, 762 S.W.2d 27, 28 (Mo. banc 1988)) (alteration in original). Thus, regardless of the procedural or substantive nature of the statute, the *express intention* of the legislature overrides the presumptive application of the statute. *See id.*

In repealing former chapter 355, the legislature not only enacted section 355.716, RSMo 2000—referred to by the trial court as support for its conclusion that the provision was to be applied retroactively—the legislature *also* enacted section 355.871, RSMo 2000, addressing specifically the effect of the repeal of former chapter 355. Section 355.871, RSMo 2000 reads, in pertinent part:

> The repeal of former chapter 355 does not affect:
>
> (1) The operation of the statute or any action taken under it before its repeal;
>
> (2) Any ratification, right, remedy, privilege, obligation or liability acquired, accrued or incurred under the statute before its repeal;
>
> (3) Any violation of the statute or any penalty, forfeiture, or punishment incurred because of the violation, before its repeal;
>
> (4) Any proceeding, reorganization or dissolution commenced under the statute before its repeal, and the proceeding, reorganization or dissolution may be completed in accordance with the statute as if it had not been repealed....

As demonstrated in section 355.871, RSMo 2000, the legislature made clear its intention that the repeal of former chapter 355 and the enactment of the new chapter was not to be applied retroactively to the "operation of the statute or any action taken under it before its repeal." § 355.871(1), RSMo 2000.

■ Here, the forfeiture was effective January 1, 1981, and the rescission was issued on April 1, 1991, ten years *and three months* after the forfeiture took effect. Because the Secretary of State derives his or her authority to act from statutes, *see Fehrman v. Blunt*, 825 S.W.2d 658, 662 (Mo.App.1992), it is clear that on April 1, 1991, the Secretary of State did not have the authority to issue the rescission because the statute prohibited the issuance of a rescission more than ten

---

7. No allegation has been made that prior to January 1, 1981, the Association was not a corporation in good standing with the Secretary of State's office.

years after the forfeiture took effect. § 355.507.4, RSMo 1986.

Given the express language of section 355.871, RSMo 2000, that the enactment of the new chapter 355 was not to be applied retroactively, section 355.716, RSMo 2000, cannot and does not validate the Secretary of State's unauthorized act of issuing the rescission of the forfeiture of the Association's charter on April 1, 1991. "[T]he legislature is not presumed to have intended a meaningless act." *Murray v. Mo. Highway & Transp. Comm'n*, 37 S.W.3d 228, 233 (Mo. banc 2001).

In its argument, the Association attempts to compare the instant matter with the situation in *Levey*. In *Levey*, the appellant alleged that the corporation filed a fraudulent affidavit in applying for the rescission of forfeiture and that the rescission was invalid because of the fraud perpetrated on the Secretary of State. *Levey*, 504 S.W.2d at 245. The court held that in situations in which the Secretary of State *has* the authority to issue a rescission of forfeiture and does so, private individuals may not collaterally attack the corporate existence of the corporation. *Id.* at 245–46. This is distinct, however, from the instant case in which the Secretary of State *did not* have the statutory authority to issue the rescission because the ten-year time limit had expired.

We now consider the effect the rescission had on the corporate status of the Association vis-à-vis the Association and Appellants, as it pertains to the Appellants' right to collaterally attack the Association's corporate status.

The trial court found the Association was a corporation "in good standing and validly existing under the laws of the State of Missouri." As the term "corporation" has different meanings under the law, we must first identify what type of corporate status, if any, the Association had at the times pertinent to this appeal.

First, we consider the status of a corporation de jure. "Strictly speaking, the term 'corporation' implies a corporation de jure...." *Pearson*, 201 S.W.2d at 488. A corporation de jure "is in all respects legal" and "its right to exist as a corporation and to exercise corporate powers in conformity with the terms of its charter" cannot be attacked "even by the state in a direct proceeding." *Id.*

As we have repeatedly noted, in the instant case, the rescission was issued on April 1, 1991, *more* than ten years after the date of forfeiture, and in clear violation of the then applicable statute—section 355.507, RSMo 1986. *See also* § 355.871, RSMo 2000. Hence, on April 1, 1991, and at all times thereafter, the corporation could not have been considered "in all respects legal." *Pearson*, 201 S.W.2d at 488. The Association did not qualify as a corporation de jure such that its corporate status could not be attacked even by the state in a direct proceeding. *See id.*

While a corporation may not be in all respects legal and, therefore, is not a corporation de jure, it may, nevertheless, have some corporate status. It is possible that some irregularity exists in the organization of the corporation that the state may attack in a direct proceeding, "but which would not be deemed sufficient to render the same void on its face." *Id.* In such a case, the corporation may exist in fact and is considered a corporation de facto. *Id.*

To constitute a corporation de facto, there must be 1) a general or special law under which the corporation might lawfully exist; 2) a bona fide attempt to organize as a corporation under the law; 3) a colorable compliance with the statutory requirements; and 4) an actual user or

exercise of corporate powers in keeping with the law and attempted organization. *Id.* In the case of a de facto corporation, only the state in a direct attack may challenge the corporate existence. *Id.* at 488–89.

In the instant case, on April 1, 1991, there was no "general or special law under which [the Association] might lawfully exist." *Id.* at 488. When the rescission was issued, the pertinent statute provided that "[n]o rescission shall be made after ten years following forfeiture." § 355.507.4, RSMo 1986. Accordingly, after January 1, 1991, more than ten years following the forfeiture, there was no statute under which the Association could lawfully exist. *See* § 355.871, RSMo 2000. Thus, from that time forward, the Association could not be considered a corporation de facto because the circumstances were such that it could not exist pursuant to any statute.

■■■ Finally, there are situations in which a corporation has "no existence at all, either de jure or de facto, in which event it will not be recognized as a legal entity. . . ." *Pearson,* 201 S.W.2d at 489. In such cases, the corporation's "pretended corporate existence may be attacked, not only in a direct proceeding by the state, but also collaterally, either by the state or by private individuals, in any action or proceeding in which its existence is brought into question." *Id.; see also* 18 C.J.S. CORPORATIONS § 62 (1990). Accordingly, the Association, as it existed after January 1, 1981, must be placed into the third category—a corporation with no legal existence, neither de jure nor de facto. Because the Association is neither de jure nor de facto, the corporate status is open to collateral attack by private individuals. *Pearson,* 201 S.W.2d at 489; *see also Bradley,* 32 S.W. at 646–47.

We find *Leibson* supports this analysis. In *Leibson,* the corporation's charter was forfeited for failure to file an annual registration report. *Leibson,* 204 S.W.2d at 311. The sole shareholders and directors of the corporation did not act to "wind up" the corporate affairs, as mandated by the statute. *Id.* at 312. Further, at no time did they apply for a rescission of the forfeiture. *Id.* at 311–12. Rather, the *Leibson* parties continued to operate as a corporation and continued to use the corporate name. *Id.* at 312. After incurring certain business obligations that forced the business to close down, the shareholders and directors were found personally liable for the obligations they incurred by acting beyond the scope of their statutory authority as trustees, which authority was otherwise limited to winding up the business affairs of the corporation. *Id.* In *Leibson,* the court concluded that the forfeiture acted to "ipso facto completely conclude the corporate entity." *Id.* at 316. The court further concluded that as a result of the *ipso facto* dissolution, the corporation ceased to be a corporation de jure or de facto and its corporate status could be questioned in a collateral attack by private individuals. *Id.* at 317.

Unlike the parties in *Leibson,* the Association in the instant case eventually sought a rescission. However, as previously explained, the rescission that was issued had no legal effect because it was issued contrary to the *then* prevailing statute, as it was issued more than ten years after the forfeiture became effective. *See* § 355.507.4, RSMo 1986. Consequently, lacking legal existence, the Association's corporate status may be attacked in a collateral proceeding. *Leibson,* 204 S.W.2d at 317.

The trial court erred in concluding that the Association was "a corporation in good standing and validly existing under the laws of the State of Missouri." The trial court also erred in its determination that

Appellants were unable to collaterally attack the corporate status of the Association. However, this Court specifically reiterates that it holds as it does because of the particular circumstances attendant to this case, combined with the applicability of the then prevailing statutory provisions, now repealed, which previously governed both the forfeiture of a corporation's charter and the rescission of such forfeiture by the Secretary of State. Point One is well taken.

We now turn to the remaining, reviewable points of trial court error.

Appellants maintain in Point Six that the trial court erred in finding that Appellants were estopped from challenging the corporate existence of the Association.

■■■ We first note that "a corporation de facto cannot be created by estoppel...." *Pearson,* 201 S.W.2d at 491. Rather, "the only effect of an estoppel, where the requisite facts exist, is to prevent the question [of corporate status] from being raised." *Id.* On the other hand, it is not necessary that "the corporation actually exist de facto in order to estop an adversary party from questioning its corporate existence." *Id.*

■■■ The general rule regarding estoppel is that "where a person has contracted and dealt with another as a corporation, he and his privies will be estopped, in a proceeding wherein such dealings are an issue, to deny the existence of the corporation." *Talbert v. Grist,* 198 Mo.App. 492, 201 S.W. 906, 907 (1918). Generally speaking, "[r]ecognition of an entity as a corporation which will give rise to an estoppel may consist in any statements, conduct or course of dealing whereby a person expressly or impliedly admits its corporate existence." FLETCHER CYC CORP § 3899 (Perm Ed).

The trial court concluded Appellants were estopped from challenging the corporate existence of the Association because: 1) Appellants' "contractual agreement" with the Baileys; 2) Appellants' "admissions in their published notices" about the Association; and 3) Appellants' "action in seeking the protection of [the Association's] government in enforcement of the subdivision restrictions and covenants."

■■■ The trial court's first reason for finding Appellants were estopped from challenging the corporate status of the Association was the "contractual agreement" Appellants made with the Baileys when Appellants purchased Lot 7 in 1974.

■■■ There is no question that all parties recognize that as of the date of the purchase of Lot 7 the Association was, indeed, a valid corporation. However, after the Association's corporate charter was forfeited in January 1, 1981, resulting in the *ipso facto* dissolution of the corporation, the parties made no further agreement recognizing the Association as a corporate entity. Hence, any pre-forfeiture understanding could not give rise to a finding of estoppel.

The trial court also identified Appellants' "published notices" regarding the Association as a reason for the trial court's finding of estoppel. Appellants' "published notices" occurred after the forfeiture of the Association's corporate charter on January 1, 1981. From our review we do not discern how they may be read to give rise to an estoppel, preventing Appellants from challenging the corporate status of the Association.

On April 15–17, 1992, the Lebanon Daily Record published a "Public Notice" authored by Valerie, which read in pertinent part:

> [T]he so-called property owners "Association" became so inactive that its

charter was terminated by the Secretary of State of Missouri in 1981. . . . At present *there exists no "Association" of property owners at Lakeshore Estates which can claim any authority for any legal sanctions against any property owner there.*

I will continue to exercise my rights as a property owner at Lakeshore Estates as those rights were originally given to me by the terms of my land purchase, including the right of access to, and use of, all the commonly owned property there. I will, when and if the conditions of the original covenant are adhered to, be willing to pay my assessments on a per lot basis provided that all other property owners do the same.

I will not recognize as legally binding any action taken by a group of property owners who call themselves the Recreation Association of Lakeshore Estates, Inc.

(Emphasis added.)

In response to a correspondence from Mark Sagebarth regarding proposed actions of the Association, Valerie wrote a letter on April 30, 1993, which read, in pertinent part:

It is our position that: *The so-called "Lake Shore Estates Recreation Association," created in 1992 (years after the demise of the originally covenanted association) has no legal authority whatsoever.* Those property owners who *voluntarily* wish to abide by its rules or policies, of course, may do so as a matter of choice. But those *property owners who choose not to abide by its "rules, policies, By-laws or covenants"* (including the proposed amendment to original restrictions) *are under no legal obligation whatsoever to do so.*

(Emphasis added.) After receiving no reply, Valerie had the letter published in a local newspaper.[8]

As previously stated, we cannot conclude from our review of these "published notices" and letters that Appellants recognized the Association as a viable corporation. Rather, the "published notices" and letters specifically referenced Appellants' view that the Association was not a validly existing corporation and had no authority to act and impose any assessments against Appellants. The foregoing "published notices" do not support the trial court's finding that Appellants were estopped by their

---

**8.** We note that on May 2, 1982, previous to Valerie's "published notices," Roy sent a letter to Glenn Drake, "who was purportedly elected president of the Association." In pertinent part, the letter read:

> I am in receipt of an unsigned document purporting to be the results of a meeting of a group calling itself the "Lake Shore Estates Association." Among other things it advises that owners who do not pay their annual assessments may be subject to a "lien." It tells me that you have been elected President.
> * * *
> . . . I have chosen not to participate in the Association as presently constituted and in consequence of its present policies.
> * * *
> . . . Some time last year, *the Secretary of State of Missouri cancelled that original*

*charter due to a failure to comply with its provisions. Its enforcement simply expired. It is no longer in force.*
> I have no quarrel with that original association, its by-laws or its charter. If it were still in force, I'm sure I would still be a member dutifully paying my dues as I did then. Too many of its good and sensible provisions are now being ignored.
> * * *
> In the end, Glenn, I do sincerely wish you success. But my attorney has assured me that this new association has no legal basis for bringing a "lien" against me or any other enforcement procedure . . . . other than upon those who voluntarily choose to subscribe to its rules—which I do not.

(Emphasis added.)

publications from challenging the corporate status of the Association.

 The final reason given by the trial court for finding an estoppel involved a meeting of the Association held on September 5, 1991. Appellants attended the meeting of the Association and complained about a sign advertising lots for sale by another owner of the lots in the subdivision as being in violation of the "subdivision's covenants" and asked the Association to compel removal of the sign. After the meeting, the landowner in question removed the offending sign. According to the person who put up the sign, he agreed to take the sign down "to be a good neighbor to a lot of people."

To give rise to an estoppel on the ground of recognition by dealing with a pretended corporation, it must have been dealt with or treated as a corporation, and *no estoppel will result from conduct which is just as consistent with the existence of an unincorporated association as with the existence of a corporation.*

FLETCHER CYC CORP § 3901 (Perm Ed) (emphasis added); *see also* 18 C.J.S. CORPORATIONS § 65 (1990). In the present case, requesting that the property owner take down the "for sale" sign is just as consistent with the existence of an unincorporated association of property owners as the existence of a duly incorporated association of property owners. Furthermore, there is no evidence that the Association acted in any corporate capacity to force the property owner to remove the sign. In fact, the property owner in question willingly took down the sign "to be a good neighbor." We cannot conclude from these facts that Appellants would be estopped from denying the incorporated existence of the Association. *See id.* We determine that the trial court erred by its determination that the contractual agree-

ment, the published notices, and the actions taken by Appellants at the September 5, 1991, meeting estopped Appellants from challenging the Association's corporate existence in a collateral attack. Point Six is well taken.

 In Point Two, Appellants maintain the trial court erred in ruling that their action was barred based under the ten-year statute of limitations, as set out in section 516.110, RSMo 2000. The trial court found that the ten-year statute of limitations began running on April 1, 1991, the date the rescission was issued by the Secretary of State. The trial court concluded that because Appellants did not file the instant action until May 11, 2001, the filing was beyond the ten-year statute of limitations. *See* § 516.110, RSMo 2000.

Appellants, on the other hand, argue the trial court improperly calculated the statute of limitations because, until the Association threatened to impose liens on Lots 6 and 7, Appellants had no basis for bringing a suit against the Association. We agree.

 Generally, a statute of limitations commences running when the right to bring a suit accrues. *Kennedy v. Microsurgery & Brain Research Inst.*, 18 S.W.3d 39, 42 (Mo.App.2000).

In the instant case, Appellants sought a declaration of whether the liens imposed by the Association pursuant to assessments were void, and requested an injunction to prevent the Association from entering any future assessments and recording any future liens against Lots 6 and 7.

 The right to bring a suit for declaratory judgment accrues when there exists: "(1) 'a legally-protected interest'; (2) 'a justiciable controversy which presents a real, substantial, presently-existing dispute as to which specific relief is sought'; (3) that the question presented is 'ripe for judicial determination'; and (4)

that the pleader has 'no adequate remedy at law.'" *Westphal v. Lake Lotawana Ass'n, Inc.*, 95 S.W.3d 144, 150 (Mo.App. 2003) (quoting *Wheeler v. Sweezer*, 65 S.W.3d 565, 568 (Mo.App.2002)). "'[W]ith respect to proceedings for a declaratory judgment ... the statute of limitations does not begin to run until an actual controversy has occurred.'" *M.H. Siegfried Real Estate, Inc. v. Renfrow*, 592 S.W.2d 488, 493 n. 2 (Mo.App.1979) (quoting *Kleinheider. v. Phillips Pipe Line Co.*, 528 F.2d 837, 844 (8th Cir., 1975)) (alteration in original); *see also Swon v. Huddleston*, 282 S.W.2d 18, 28, 29 (Mo.1955). "'A mere difference of opinion or disagreement on a legal question is insufficient, but parties must show that their rights and liabilities are affected.'" *Kinder v. Holden*, 92 S.W.3d 793, 804–05 (Mo.App.2002) (quoting *Akin v. Dir. of Revenue*, 934 S.W.2d 295, 298 (Mo. banc 1996)).

■ A request for injunctive relief must be based on "a real apprehension that future acts 'are not only threatened but will in all probability be committed.'" *St. Louis County v. St. Louis County Police Officers Ass'n, Local 844*, 652 S.W.2d 142, 145 (Mo.App.1983) (quoting *Hudson v. School Dist.*, 578 S.W.2d 301, 312 (Mo.App. 1979)).

The trial court concluded the statute of limitations began to run when the rescission was issued on April 1, 1991. However, our review of the record reveals that Appellants' right to bring suit for declaratory judgment and injunctive relief had not accrued as of that date. This is because as of April 1, 1991, there was no actual controversy that affected Appellants' rights and liabilities.

As evidenced by the letters and publications, Appellants and the Association did have a difference of opinion regarding the corporate status of the Association prior to April 1, 1991; however, this mere differ-

ence of opinion, alone, is insufficient to give rise to an actual controversy ripe for judicial determination. *See Kinder*, 92 S.W.3d at 804–05. Until November 7, 2000, when the Association threatened to file a lien on Valerie's properties if Appellants failed to pay the 2000 annual assessment, no actual controversy existed that would have entitled Appellants to seek declaratory judgment or injunctive relief. *Id.* Thus, the statute of limitations could not have started running prior to November 7, 2000—the date of the letter notifying Appellants of the assessment and threat to impress a lien. Accordingly, Appellants had until November 7, 2010, to initiate their cause of action. Because Appellants filed the instant suit on May 11, 2001, well within the ten-year statute of limitations period, the trial court erred in finding Appellants' petition was barred by the ten-year statute of limitations. *See id.* Point Two is well-taken.

■ In Appellants' third point on appeal, they argue the trial court erred in finding Appellants were contractually bound to recognize the validity of the Association and were otherwise unable to resign from the Association so long as they owned property in Lake Shore Estates. Appellants maintain that even if the Association were a third party beneficiary to the contract, when the Association failed to seek and receive a timely rescission of the forfeiture of its corporate charter, any obligation Appellants may have had with the Association ceased to exist.

The trial court's conclusion that Appellants are contractually bound to recognize the validity of the Association is based on the clause in the 1974 sales contract between Appellants and the Baileys, which provided:

10. That as and for further consideration, Buyer shall have the free and

uninhibited use of the lakes located with Lake Shore Estates, subject only to the rules and regulations promulgated and established by [the Association]; and further, that Buyer hereby automatically becomes a member of [the Association], with all the rights and privileges appertaining thereto.

We determine the foregoing provision gratuitously granted membership in the Association to Appellants "subject to rules and regulations promulgated ... with all the rights and privileges appertaining thereto." The record is devoid of a showing that the bylaws then in place authorized the imposition of any assessments on any lots located in Lake Shore Estates subdivision.

Furthermore, as we previously determined, once the Association's charter was forfeited and the Association failed to apply for a timely rescission of the forfeiture, the Association ceased to exist. At that time, there was no longer an association in which Appellants could be members— whether contractually obligated to be or not. *See* discussion of Point One herein.

 Here, parallels may be drawn to contract cases involving excuse to perform based on frustration of purpose. In such cases, it is generally held that when a party to a contract agrees to perform under the contract and the performance is possible, the party must make good unless "performance is rendered impossible by an Act of God, the law, or the other party." *Asbury v. Crawford Elec. Co-op., Inc.*, 51 S.W.3d 152, 158 (Mo.App.2001). An implied covenant of good faith and fair dealing exists in every contract, and a party cannot by its own act place itself in a position where it is unable to perform a contract and then plead the inability as an excuse for nonperformance. *Id.*

In the instant case, the Association made it impossible for Appellants to perform, presupposing a legal obligation to do so. There is nothing in the record to suggest the Association was incapable of maintaining its status as a corporation, which would have preserved any duties Appellants may have had. Nonetheless, the Association failed to maintain its corporate status, as discussed above, and ceased to exist. Therefore, Appellants are unable to perform that part of the contract as written. Point Three is well taken.

The judgment is reversed and remanded for further proceedings consistent with this opinion. All pending motions are denied.

JAMES K. PREWITT, J., dissents in separate opinion.

GARRISON, J., concurs.

JAMES K. PREWITT, Judge, dissenting.

I respectfully dissent. I believe it is bad public policy to allow a collateral attack on the existence of a corporation when the Secretary of State shows it to be in good standing. I do not believe the authorities on which the principal opinion relied compel the result reached in that opinion. Putting into question the existence of every corporation, notwithstanding a certificate of good standing, may create numerous concerns, including, but not limited to, the validity of conveyances by a corporation.